# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SYLVESTER L. JAKUBIAK, | ) | |
|     Plaintiff, | ) | |
|  | ) | |
|     v. | ) | CIVIL ACTION |
|  | ) | NO. 4:16-40162-TSH |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
|  | ) | |
|     Defendant. | ) | |

**ORDER AND MEMORANDUM ON PLAINTIFF'S MOTION FOR ORDER REVERSING DECISION OF COMISSIONER (Docket No. 15) AND DEFENDANT'S MOTION FOR ORDER AFFIRMING DECISION OF COMMISSIONER (Docket No. 17)**

**October 10, 2018**

**HILLMAN, D.J.**

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying the application of Sylvester Jakubiak ("Plaintiff") for Supplemental Security Income ("SSI") benefits because he was not disabled as that term is defined by the regulations during the relevant time period. Plaintiff has filed a Motion for Order Reversing the Decision of the Commissioner (Docket No. 15), and the Commissioner has filed a cross Motion to Affirm the Commissioner's Decision. (Docket No. 15). For the reasons set forth below, Plaintiff's motion (Docket No. 15) is ***denied*** and Defendant's motion (Docket No. 17) is ***granted***.

**Background**

1

## 1. Procedural History

Plaintiff filed for disability benefits under Title XVI on April 30, 2013, alleging disability as of July 15, 2010. (AR 201-209). His claim was denied at the initial and reconsideration levels. (AR 87-109). Subsequently, Plaintiff requested and received an administrative hearing. (AR 122). After the hearing, Administrative Law Judge Michael P. Breton ("ALJ") concluded that Plaintiff was not disabled (AR 15-27).

The Appeals Council denied Plaintiff's Request for Review of this decision, and the ALJ's decision became the final decision of the Commissioner. (AR 1-6). Plaintiff has exhausted his administrative remedies, and this case is therefore now ripe for review under 42 U.S.C. 405(g).

## 2. Medical History

In February 2010, Plaintiff began treatment at Arbour counseling Services. Clinicians noted that Plaintiff suffered from anxiety, depression, racing thoughts, aggravation, anger, feelings of hopelessness, low motivation and poor sleep. He was diagnosed with anxiety disorder. (AR 297-300).

On May 3, 2013, Plaintiff underwent a psychiatric examination of Arbour. He complained that he was "under a lot of stress" because he was attempting to regain custody of his son and care for his mother. (AR 303). He was again diagnosed with anxiety disorder and prescribed Neurontin. (AR 303-306). On June 7, 2013, Plaintiff attended a medication management appointment at Arbour and indicated that his medications were not working. He was therefore prescribed Prozac. (AR 308). On September 6, 2013, Plaintiff had another medication management appointment and complained that he still experienced anxiety and depression. He was prescribed Neurontin and Effexor. (AR 377-78).

On October 11, 2013, Plaintiff saw Dr. Milton Taylor for a consultative psychological examination. Plaintiff's chief complaints were "mental problems" and that he had been told that

he had an IQ of 62. Dr. Taylor noted Plaintiff's history of anxiety and depression and his difficulty maintaining employment due to his inability to read or write. For instance, Plaintiff attended a welding program after finishing high school but could not get a certificate because he was unable to read blueprints. (AR 363-67).

Regarding Plaintiff's mental health, Dr. Taylor noted that Plaintiff described himself as depressed, "although this was not particularly evident" and he "seemed quite mellow." (AR 366). Plaintiff reported that "he can become snappy and impatient with people . . . [and] can be moody, grouchy, and irritable." (AR 366). Cognitively, Plaintiff could follow simple three-step commands, perform serial 7 subtraction, spell the word "world" forward and backward, and immediately recall three common objects and recall two of the three after a time interval. (AR 366). According to Dr. Taylor, Plaintiff's cognitive and mental health "would limit his range of work" but he "has no interest in working or developing a career." (AR 367).

On October 16, 2013, state agency psychologist Dr. Ginette Langer reviewed Plaintiff's records and issued a report regarding his mental functioning. (AR 91-95). In Dr. Langer's opinion, Plaintiff's impairments resulted in mild limitations in his ability to perform daily activities and moderate restrictions in social functioning, concentration, persistence, and pace. (AR 92). Regarding his Residual Functional Capacity, Dr. Langer opined that Plaintiff could: understand and remember simple instruction; concentrate, sustain attention, and keep pace on simple tasks for two hours at a time; adapt to routine changes in the work setting; and handle occasional social interactions with the general public. (AR 94-95). Dr. Langer also noted that Plaintiff "will be able to handle supervisory oversight only on simple tasks [and] will have occasional episodes of irritability." (AR 95).

On November 7, 2013, Plaintiff attended a final psychiatric review at Arbour Counseling. (AR 433-35). He complained that he was "depressed sometimes." (AR 433). During the exam, he appeared disheveled and occasionally lost focus but otherwise his eye contact, psychomotor status and affect were normal, his mood was "relaxed," and his energy level was "good." (AR 434). Plaintiff was again diagnosed with anxiety and depression and prescribed Neurontin. (AR 434-35). In addition, Plaintiff was assessed a Global Assessment of Functioning ("GAF") score of 60. (AR 435).[1] On March 20, 2014, another state agency psychologist, Dr. Katheryn Collins-Wooley, reviewed Plaintiff's medical records and agreed with Dr. Langer's earlier assessment. (AR 103-107).

On January 4, 2015, Plaintiff began treatment at the Multicultural Wellness Center. He was noted to be suffering from anxiety, depression, mood swings, racing thoughts, and weight loss. (AR 381-89). He was diagnosed with mood disorder and provided a treatment plan. (AR 390-94). On February 4, 2015, Plaintiff was seen at the Multicultural Wellness Center for an initial intake assessment. He complained of ongoing anxiety and depression. (AR 381). He was again diagnosed with mood disorder and assigned a GAF score of 63. (AR 390-91).[2]

On February 27, 2015, Plaintiff saw Dr. Celest N. Derecho at the Multicultural Wellness Center. Plaintiff displayed poor recall and was unable to calculate serial 7s. Intelligence testing indicated that he had an IQ of 71, reading at the 5th grade level, reading comprehension at the 3rd grade level, and math skills at the 4th grade level. Dr. Derecho diagnosed Plaintiff with substance abuse in remission, bipolar disorder, anxiety disorder, personality disorder, and borderline

---

[1] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. text revision 2000).

[2] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or social functioning. The patient is generally functioning well and has some meaningful interpersonal relationships. *See id.*

intellectual functioning. In her view, Plaintiff "would be capable of learning simple instructions in a routine job but given the range of difficulties he would have the best chance of success if he is provided with special supervision, a job coach, and placement in a situation that does not have much communication with other people." (AR 409-13).

## Standard of Review

This Court may not disturb the Commissioner's decision if it is grounded in substantial evidence. 42 U.S.C. 405(g); 1383(c)(3). Substantial evidence exists when there is sufficient evidence that a reasonable person could agree with the conclusion. *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981). Thus, this Court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion, even if the administrative record could support multiple conclusions." *Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quotation marks and citation omitted).

## Standard of Entitlement to Social Security Disability Insurance

A claimant is disabled for purposes of SSDI if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Unable to engage in any substantial gainful activity" means the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

The Commissioner assesses a claimant's impairment under a "five-step sequential evaluation process" outlined in the statute. *See* 20 C.F.R. § 404.1520.

The hearing officer must decide: (1) whether the claimant is engaged in "substantial gainful activity"; (2) whether the claimant suffers from a "severe impairment"; (3) whether the impairment "meets or equals" one of the listed impairments contained in Appendix 1 to the regulations; (4) whether the claimant's residual functional capacity ("RFC")[3] precludes him from engaging in previous relevant employment; and (5) whether the claimant's RFC precludes him from doing any work considering the claimant's age, education, and work experience. *See id*. If the hearing officer concludes at any step of the evaluation process that the claimant is or is not disabled, the inquiry does not continue to the next step. *See* 20 C.F.R. § 404.1520.

The claimant has the burden of showing that he is disabled through step four of the analysis. At step five, however, the burden shifts to the Commissioner who must show that there are jobs in the national economy the claimant can perform notwithstanding his impairments. *See Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 7 (1st Cir. 1982).

## **The ALJ's Decision**

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between April 20, 2013, when he applied for SSI benefits, and May 14, 2015, the date of the ALJ's decision. (AR 17).[4] At step two, the ALJ determined that Plaintiff's "Borderline Intellectual Functioning [and] Personality Disorder" were "severe impairments." (AR 17). At step three, the

---

[3] Before proceeding to steps four and five, the Commissioner must assess the claimant's ("RFC"), which the Commissioner applies at step four to determine whether the claimant can perform past relevant work and at step five to determine if the claimant can perform any other work. *See* 20 C.F.R. § 404.1520. "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

[4] Plaintiff is not entitled to SSI benefits before the date he filed his application. 20 C.F.R. 416.202(g).

ALJ held that Plaintiff "does not have an impairment or a combination of impairments that meets or medically equals the severity of one of the listed impairments" contained in Appendix 1 to the regulations. (AR 21). Then, the ALJ found that Plaintiff had the RFC to perform:

> A full range of work at all exertional levels but with the following nonexertional limitations: He is limited to simple, routine, repetitive, 1-2 step tasks, which require concentration for two hour time periods. No interaction with the general public. No more than occasional interaction with coworkers. [He] should work with things rather than people. Work should not require reading or writing English. (AR 23).

At step four, the ALJ determined that Plaintiff "ha[d] no past relevant work." (AR 32). At step five, however, the ALJ found that "[c]onsidering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform" and that he was therefore not disabled. (AR 26-27).

## Discussion

"With a few exceptions . . . an ALJ, as a lay person is not qualified to interpret raw data in a medical record." *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996). Therefore, for an ALJ to make a disability determination, "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Santiago v. Sec'y of Health & Human Servs.*, 944 F.3d 1, 7 (1st Cir. 1991). In addition, an ALJ may not simply disregard relevant evidence, particularly when that evidence bolsters the claimant's entitlement to benefits. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ was not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion."); *Dedis v. Chater*, 956 F. Supp. 45, 51 (D. Mass 1997) ("While the ALJ is free to make a finding which gives less credence to certain evidence, he cannot simply ignore . . . the body of evidence opposed to . . . [his] view.") (quotation marks and citations omitted).

The ALJ found that Plaintiff retained the RFC to perform:

> A full range of work at all exertional levels but with the following nonexertional limitations: He is limited to simple, routine, repetitive, 1-2 step tasks, which require concentration for two hour time periods. No interaction with the general public. No more than occasional interaction with coworkers. [He] should work with things rather than people. Work should not require reading or writing English. (AR 23).

Plaintiff argues that the ALJ ignored uncontroverted medical evidence supporting Plaintiff's claim and instead relied on his own lay opinion. In Plaintiff's view, Dr. Derecho's and the state agency psychologists' opinions required a more restrictive RFC than the ALJ found. I find, however, that the ALJ decision is consistent with the opinions of both Dr. Derecho and the state agency psychologists, and that the ALJ did not rely on his own lay opinions.[5]

### *1. Dr. Derecho*

Plaintiff contents that the "ALJ failed to address in his decision Dr. Derecho's opinion about needing special supervision." (Docket No. 18 at 8). According to Plaintiff, Dr. Derecho's opinion mandated a more restrictive RFC because she concluded that Plaintiff "would have the best chance of success if he is provided with special supervision, a job coach, and placement in a situation that does not have much communication with other people." (AR 409-13).

This is a mischaracterization of Dr. Derecho's report. Dr. Derecho did not say that Plaintiff required special supervision, only that it would give him the best chance of success. Optimal conditions, however, are not necessary ones. The RFC "is the *most you can still do* despite your limitations." 20 C.F.R 416.945(a)(1) (emphasis added). Thus, the ALJ's RFC conclusion only needed to assess the necessary conditions for Plaintiff to work given his limitations. According to

---

[5] It should be noted that the ALJ could have reasonably found a *less* restrictive RFC. Indeed, the ALJ admitted "giv[ing] the claimant the benefit of the doubt in the residual functional capacity." (AR 24). For instance, while Plaintiff claims to be illiterate, Dr. Taylor noted that he could spell "world" forwards and backwards. (AR 336). Further, Dr. Derecho noted that his abilities were between the third and fifth grade levels for reading, writing, and math. (AR 409-13). Nonetheless, the ALJ limited Plaintiff to work that "should not require reading or writing English." (AR 23).

8

Dr. Derecho, special supervision was not a necessary condition. Further, Drs. Langer and Collins-Wooley explicitly found that Plaintiff did not need special supervision. (AR 94; 106). Therefore, I find that it was not an error for the ALJ to omit the recommendation for supervision in his RFC assessment. *See Mills v. Apfel*, 244 F.3d 1, 7 (1st Cir. 2001) ("Just what weight should be given to a 'may' diagnosis is itself a difficult question whose answer may depend very much on context.").

In addition, the ALJ did not ignore Dr. Derecho's opinions. Indeed, he incorporated them into his recommendation. He summarized her conclusions as finding "the claimant could understand and learn simple instructions of a routine job. He would do best in a position that required limited communication with others." (AR 21). He then acknowledged that given the "limited evidence in the file, the undersigned puts great weight into the opinion of Dr. Derecho in formulating the residual function capacity." (AR 25). The ALJ subsequently limited Plaintiff to a jobs with "simple, routine" tasks and "[n]o interaction with the general public" in accordance with Dr. Derecho's findings. (AR 23).

### 2. *Drs. Langer and Colling-Wooley*

Plaintiff further argues that the ALJ "was silent" about Drs. Langer and Colling-Wooley's opinions regarding supervision, and that he "used his lay knowledge to assume that a reduction to occasional interaction with coworkers would eliminate [the] limitation regarding irritability." (Docket No. 16 at 11).

The ALJ, however, was not "silent" regarding the opinions of the doctors. Both doctors concluded that Plaintiff "will be able to handle supervisory oversight only on simple tasks." (AR 95; 107). In accordance with these findings, the ALJ restricted Plaintiff to "simple, routine, repetitive, 1-2 step tasks." (AR 23). Further, the doctors concluded that Plaintiff "will only be able to handle occasional social interactions" and "will have occasional episodes of irritability." (AR

95; 107). Therefore, the ALJ limited Plaintiff's interactions to account for this irritability and "to address his personality disorder. The limited contact reduces the risk of the claimant becoming irritated or aggressive. The claimant's being required to do work with things rather than people further minimiz[es] his interaction." (AR 25). Thus, contrary to Plaintiff's contentions, the ALJ not only accounted for the doctors' findings, he adopted them.

Finally, the ALJ did not use his lay opinion by assuming a reduction in social interaction would mitigate Plaintiff's irritability. Plaintiff argues that "occasional irritability could impact Plaintiff's ability to complete tasks, interact with others, or be on-task." (Docket No. 16 at 12). While this is undoubtedly true, Drs. Langer and Collins-Wooley concluded that Plaintiff could concentrate, sustain attention and keep pace on simple tasks for two hours at a time and could handle occasional social interactions with the general public. (AR 94-95; 106-07). In short, Drs. Langer and Collins-Wooley described what Plaintiff could do despite his limitations. Ironically, by arguing that there should be more functional restrictions based on his medical record, Plaintiff is using his own lay opinion to interpret the record.

Finally, Plaintiff argues that it was "illogical" for the ALJ to adopt Drs. Langer and Colling-Wooley's findings of "moderate limitations for the B criteria" while adopting "more limitations in the RFC." (Docket No. 16 at 11). However, paragraph B limitations "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996).[6] Moreover, even if the more moderate limitations in the paragraph B assessment did qualify as an RFC assessment,

---

[6] Paragraph B criteria are met when the claimant's disorder(s) result in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social function; or (3) market difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpt. P, App. 1. "Marked" difficulty means difficulty that is "more than moderate but less than extreme." *Id.*

"Plaintiff has no basis for an objection to the RFC assessment crafted by the ALJ when it was more conservative than the recent RFC assessments of nonexamining reviewing physicians on which the ALJ was entitled to rely." *Halla v. Colvin*, No. 15-CV-30021-KAR, 2016 WL 234802, at *7 (D. Mass. Jan. 20, 2016). *See Arruda v. Barnhart*, 314 F. Supp. 2d 52, 74 (D. Mass. 2004).

## Conclusion

For the reasons stated above, I find that the ALJ neither ignored evidence nor relied on his lay opinion. Further, I find that the decision was grounded in substantial evidence. Therefore, Plaintiff's motion (Docket No. 15) is ***denied*** and Defendant's motion (Docket No. 17) is ***granted***.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**